**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**ROSS MOORE THACKER,**

**Plaintiff,**

**v.**                                    **CIVIL ACTION NO.: 3:23-CV-201
(GROH)**

**DR./MAT EMERY MCCOY, and
P.A. ALICIA WILSON,**

**Defendants.**

## <u>REPORT AND RECOMMENDATION</u>

### I.    INTRODUCTION

On September 5, 2023, the *pro se* Plaintiff, who is a federal prisoner incarcerated at Gilmer FCI, initiated this case by filing an action pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), claiming his Constitutional rights were violated. ECF No. 1.[1] The Plaintiff paid the initial partial filing fee on November 17, 2023. ECF No. 10.

The matter is before the undersigned for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR PL P 2. For the reasons set forth below, the undersigned recommends that the complaint be denied and dismissed without prejudice.

---

[1] All CM/ECF numbers cited herein are from the instant case, 3:23-CV-201, unless otherwise noted.

## II. FACTUAL AND PROCEDURAL HISTORY

### A.    The Plaintiff's Complaint

The Plaintiff initiated this litigation on September 5, 2023, by filing a complaint with attachments. ECF Nos. 1, 1-1 through 1-4. Construed liberally, the sole claim asserted in the complaint is that the Plaintiff was subjected to Cruel and Unusual Punishment in violation of the Eighth Amendment because he was denied adequate medical care for a diagnosed case of H. pylori,[2] and the Defendants were deliberately indifferent to the Plaintiff's serious medical condition. ECF No. 1 at 8–10. The Plaintiff concedes that he was "constantly" seen by the Defendants from May 2022, through November 2022, when he was provided a colonoscopy by an outside provider at Stonewall Jackson Memorial Hospital. Id. at 10. The Plaintiff claims that after his colonoscopy, he was never seen by the doctor. Id. As a result of these actions and failure "to provide the necessary medical screening," the Plaintiff contends that he now must be constantly treated and monitored and will be required "to take medication with adverse side [effects] for major portions of [his] life." Id. at 11. Further, the Plaintiff contends that he was informed in July 2023, that

---

[2] According to the Mayo Clinic:

Helicobacter pylori (H. pylori) infection occurs when Helicobacter pylori (H. pylori) bacteria infect[s] [the] stomach. This usually happens during childhood. A common cause of stomach ulcers (peptic ulcers), H. pylori infection may be present in more than half the people in the world.

Most people don't realize they have H. pylori infection because they never get sick from it. If you develop signs and symptoms of a peptic ulcer, your health care provider will probably test you for H. pylori infection. A peptic ulcer is a sore on the lining of the stomach (gastric ulcer) or the first part of the small intestine (duodenal ulcer).

H. pylori infection is treated with antibiotics. . . .

H. pylori bacteria are usually passed from person to person through direct contact with saliva, vomit or stool. H. pylori may also be spread through contaminated food or water. The exact way H. pylori bacteria causes gastritis or a peptic ulcer in some people is still unknown.

https://www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes/syc-20356171.

the bacteria in his intestines resulted in Irritable Bowel Syndrome ("IBS"). Id. at 10.

In his request for relief, the Plaintiff asks the court to award him compensatory damages in the amount of three million dollars ($3,000,000.00), and punitive damages in the amount of two million dollars ($2,000,000.00). Id.

The Plaintiff claims he exhausted his administrative remedies prior to filing his complaint. Id. at 6–7. Attached to his complaint are the following copies of the administrative remedy process:

(1)    Request for Administrative Remedy, Informal Resolution Form, dated November 2, 2022, and denied November 10, 2022 [ECF No. 1-2 at 2–3];

(2)    Request for Administrative Remedy ID number 1143756-F1, signed on November 21, 2022 [Id. at 8–9];

(3)    December 16, 2022, Response of the Acting Warden to Administrative Remedy ID number 1143756-F1, received and filed on December 6, 2022, which summarized the Plaintiff's medical treatment for his complaints from December 13, 2021, through December 8, 2022 [Id. at 10–11];

(4)    Regional Administrative Remedy Appeal submission, ID number 1143756-R1 which is undated[3] [Id. at 13];

(5)    Administrative Remedy ID number 1143756-R1, rejection notice dated February 15, 2023, based on (1) the Plaintiff's failure to timely file his appeal within 20 days of the Warden's response or receipt of the DHO report, and (2) failure to provide staff verification stating that the Plaintiff's untimely filing was not his fault [Id. at 7];

---

[3] According to the February 15, 2023, rejection notice, Administrative Remedy ID number 1143756-R1 was received on February 13, 2023. ECF No. 1-2 at 7.

(6)     Central Office Administrative Remedy Appeal signed on March 23, 2023 [Id. at 14]; and

(7)     Central Office Administrative Remedy ID number 1143756-A1, rejection notice dated April 14, 2023, that states, "[c]oncur with rationale of Regional Office and/or Institution for rejection. Follow directions provided on prior rejection notices" [Id. at 12].

The Plaintiff also attached copies of emails between himself and Health Services regarding his medical concerns. ECF Nos. 1-2 at 4–6, 1-3. Further, the Plaintiff filed copies of his medical records. ECF No. 1-4.

**B.     The Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment**

On May 21, 2024, the Defendants filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and a memo and exhibits in support thereof. ECF Nos. 36, 37, 37-1 through 37-5. The Defendants argue that the Plaintiff's claims must be dismissed because: (1) the Plaintiff failed to exhaust his administrative remedies prior to filing his complaint, as required by 28 U.S.C. § 542.10 *et seq*. [ECF No. 37 at 12–18]; (2) the claims raised by the Plaintiff present a new context not authorized under Bivens [Id. at 18–31]; (3) the Plaintiff has failed to state a claim of deliberate indifference [Id. at 31–33]; and (4) the Defendants are entitled to qualified immunity from liability [Id. at 33–35]. Attached thereto are the following exhibits:

(1)     A Declaration of Shea Thomas, the Health Services Administrator at FCI Gilmer, dated May 8, 2024 [ECF No. 37-1];

(2)     A Declaration of Misty Shaw, a paralegal with the Mid-Atlantic Regional Office of the BOP, dated April 29, 2024 [ECF No. 37-3];

(3)     "Administrative Remedy Generalized Retrieval" dated April 25, 2024, which lists the following thirty-one administrative remedies filed by the Plaintiff, and the disposition of each. ECF No. 37-4. Only the following five administrative remedies relate to a health complaint submitted by the Plaintiff:

    a.  Remedy ID 798334-F1, filed at the facility level, related to "downgraded meds," which was filed October 20, 2014, and closed October 20, 2014 [ECF No. 37-4 at 4];

    b.  Remedy ID 1143756-F1, filed at the facility level, regarding "multiple medical complaints," which was filed on December 6, 2022, and closed with an explanation on December 6, 2022 [Id. at 13];

    c.  Remedy ID 1143756-R1, filed at the Regional Office level, regarding "multiple medical complaints," which was filed on February 13, 2023, and rejected on February 14, 2023 [Id.];[4]

    d.  Remedy ID 1143756-Al, filed at the Central Office level, regarding "multiple medical complaints," which was filed on April 4, 2023, and rejected on April 14, 2023 [Id. at 14]; and

    e.  Remedy ID 1175858-F1, filed at the facility level, regarding complaints of "stomach issues," which was filed on September 18, 2023, and closed on September 18, 2023 [Id. at 15].

(4)     "Declaration of Evan Aldridge" dated April 25, 2024, stating that as a Special Investigation Services ("SIS") Technician at FCI Gilmer he has "reviewed

---

[4] The Administrative Remedy Generalized Retrieval dated April 25, 2024, lists this remedy as rejected on February 14, 2023, but the rejection notice submitted as an exhibit by the Plaintiff is dated February 15, 2023. ECF Nos. 37-4 at 13, 1-2 at 7.

the BOP records and discovered that, between December 19, 2022, and April 4, 2023, FCI Gilmer was in full institutional lockdown status on the following dates: December 8–12, 2022; December 13–20, 2022, and; March 2–9, 2023." [ECF No. 37-5]; and

(5)    Under seal, 409 pages of medical records for the Plaintiff [ECF Nos. 43, 43-1].

**C.    Plaintiff's Response to the Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment**

Following the May 21, 2024, issuance of a Roseboro notice [ECF No. 40], the Plaintiff filed a response on June 13, 2024. ECF No. 51. In his response, the Plaintiff argues that:

(1)    The records "clearly show[ ] that [he] exhausted all available administrative remedies," but that he was prevented[5] from timely appealing to the Mid-Atlantic Regional Office because he was denied a memo from the unit manager to explain that the Plaintiff was untimely because of an institutional lockdown [Id. at 3–7];

(2)    His Bivens action does not present a new context, but rather presents parallel circumstances which merit relief, citing Gray v. Plauger, No. CV SAG-22-77, 2023 WL 2410852 (D. Md. Mar. 8, 2023), and Head v. Rakowski, No. CV JKB-22-00566, 2023 WL 6388301 (D. Md. Sept. 29, 2023) to support his claims [Id. at 7–9], and that:

(a)    His case presents a scenario which is "virtually the same in every

---

[5] In his complaint, the Plaintiff stated that, "[t]he Regional Office and the central office were aware that the institution was on lockdown due to the covid-19 outbreak. However[,] the administration refused to provide the Plaintiff with an institutional memo to excuse the delay in filing the administrative appeals which prohibited the Plaintiff from filing his appeal and exhausting his administrative remedies." ECF No. 1 at 7.

instance" as that presented in Carlson [Id. at 10];

(b)     Medical staff improperly mischaracterized the Plaintiff's medical complaints and "refused to administer the appropriate request as requested" [Id.];

(c)     The Defendants failed to follow BOP Program Statement 6031.04,[6] entitled "Patient Care," and § 549.11[7] entitled "Infectious Diseases Management" in treating the Plaintiff, even though at  that time there was an outbreak of H. pylori from "contaminated water from the coal mines underneath the institution" [Id. at 11–12];

(d)     His case is like Carlson, based on "the deliberate indifference to a serious [medical] need and the culpable negligence" of the Defendants [Id. at 12–13];

(e)     The facts and sworn affidavits of other inmates who contracted H. pylori show that the institution and medical department were aware of the risks posed by their inaction which constituted deliberate indifference [Id. at 13–15];

(3)     The Defendants are not entitled to absolute immunity because neither is an officer or employee of the United States Public Health Service [Id. at 17].

The Plaintiff attaches to his response copies of two affidavits signed by himself dated May 30, 2024 [ECF No. 51-1 at 1–3], one affidavit signed by himself dated May 27, 2024 [Id. at 4–5], and four affidavits from fellow prisoners Anthony Williams, Karlos

---

[6]  See https://www.bop.gov/policy/progstat/6031_004.pdf.

[7]  Although § 549.11 is a code section cited in the BOP Program Statement on Infectious Disease Management, the Program Statement is 6190.04. See https://www.bop.gov/policy/progstat/6190_004.pdf.

Clinton, Dennis Johnson, and Malcolm Carpenter [Id. at 6–12], all related to the Plaintiff's contraction and diagnosis of H. pylori.

Critically, although the Plaintiff mentions the Egbert decision, he does not substantively address the impact of Egbert on his claims. ECF No. 51 at 7, 9.

### D.    The Defendants' Reply

On June 27, 2024, the Defendants filed a reply which relies upon the facts and arguments previously asserted in their motion to dismiss and accompanying memorandum. ECF No. 56 at 1. Further, the Defendants argue although the Plaintiff asserts that he could not exhaust his administrative remedies because his facility was on lockdown, that argument does not match the lockdown records of the facility. During the relevant time period between December 10, 2022, and April 4, 2023, "FCI Gilmer was only on full lockdown status from December 8–12, 2022; December 13–20, 2022, and March 2–9, 2023, and thus the Plaintiff had sufficient time to exhaust his remedies. Id. at 2.  Moreover, the Defendants assert that "dozens of other administrative remedies were filed by other inmates during the time that Plaintiff claims the administrative remedy process was unavailable to him. Id. The Defendants submitted a declaration of the secretary for the FCI Gilmer warden, and SENTRY records as exhibits to shows that "from December 19, 2022, through February 13, 2023, inmates at FCI Gilmer filed 16 institutional remedies (BP-9), 40 regional office appeals (BP-10, and 8 central office appeals (BP-11) for a total of 64 administrative remedies." ECF Nos. 56-1 through 56-4. According to the Defendants, the submitted records demonstrate that the Plaintiff's claim that he was denied access to the administrative remedy process because the facility was on lockdown, is inconsistent with the records of the facility and other administrative

remedies filed during the relevant time frame.

Second, the Defendants contend that a <u>Bivens</u> remedy is not available for the Plaintiff's claims, and the cases cited by the Plaintiff in support of his claims are distinguishable. The Defendants contend that in the two cases cited by the Plaintiff, both plaintiffs deliberate indifference claims would fail. <u>Id.</u> at 3. <u>See</u> <u>Gray v. Plauger</u>, No. CV SAG-22-77, 2023 WL 2410852 (D. Md. Mar. 8, 2023) (medical injuries); <u>Head v. Rakowski</u>, No. CV JKB-22-00566, 2023 WL 6388301 (D. Md. Sept. 29, 2023) (failure to provide medication and contact lenses). Further, the Defendants argue that the Plaintiff's claims of an "epidemic" of H. pylori cases were not asserted in the Plaintiff's complaint, and the submitted affidavits consist of affiants who "are simply repeating that they heard about problems and that Mr. Thacker tested positive for H. pylori." ECF No. 56 at 3.

Finally, the Defendants reassert that the Plaintiff's claims are distinguishable from <u>Carlson v. Green</u>, 446 U.S. 14, 16, n.1 (1980), "on the underlying facts alone." <u>Id.</u> In <u>Carlson</u>, the defendants kept the decedent in a facility against medical recommendation, failed to give him competent medical attention for eight hours after he had an asthmatic attack, administered contraindicated drugs which worsened his attack, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital where he died. By comparison, the Plaintiff here claims, "consistent treatment through a period of two years, during which he was non-complaint with suggestions by medical staff," and where he received constant treatment that "was simply not the treatment he wanted." ECF No. 56 at 3–4.

### III.    LEGAL STANDARDS

#### A.    Pro Se Litigants

Courts must read *pro se* allegations in a liberal fashion and hold those pro se pleadings "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Pursuant to 28 U.S.C. § 1915A(b), the Court is required to perform a judicial review of certain suits brought by prisoners and must dismiss a case at any time if the Court determines that the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. A complaint is frivolous if it is without arguable merit either in law or in fact. Neitzke v. Williams, 490 U.S. 319, 325 (1989) (superseded by statute). The Supreme Court in Neitzke recognized that:

> Section 1915(d)[8] is designed largely to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate because of the costs of bringing suit and because of the threat of sanctions for bringing vexatious suits under Federal Rule of Civil Procedure 11. To this end, the statute accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.

490 U.S. at 327. Frivolity dismissals should only be ordered when the legal theories are "indisputably meritless." Id.

Plaintiff is proceeding *pro se* and therefore the Court must liberally construe his

---

[8] The version of 28 U.S.C. § 1915(d) which was effective when Neitzke was decided provided, "The court may request an attorney to represent any such person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious." As of April 26, 1996, the statute was revised and 28 U.S.C. § 1915A(b) now provides, "On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint-- (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."

pleadings. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285 (1976); Haines v. Kerner, 404 U.S. 519, 520 - 1, 92 S.Ct. 594, 596 (1972) (per curiam); Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197 (2007). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, 404 U.S. at 520–21. "[T]he mandated liberal construction afforded to pro se pleadings 'means that if the court can reasonably read the pleadings to state a valid claim on which the petitioner could prevail, it should do so.'" Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir.1999). However, "judges are [ ] not required to construct a party's legal arguments for him." Small v. Endicott, 998 F.2d 411, 417–8 (7th Cir.1993).

### B.    Civil Rights Actions Under Bivens.

In Bivens, supra, the Supreme Court recognized that claimants may assert a cause of action for damages caused by federal agents. In FDIC v. Meyer, 510 U.S. 471, 484 - 86 (1994), the Court held that federal agencies may not be held liable in a Bivens claim, writing, "*Bivens* from its inception has been based . . . on the deterrence of individual officers who commit unconstitutional acts." Id. See Correctional Services Corp. v. Malesko, 534 U.S. 61, 71 (2001).

Pursuant to Bivens, an individual federal agent may be found liable for actions "in excess of the authority delegated to him." 403 U.S. at 397. "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001). The Supreme Court further explained in Malesko:

> If a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a *Bivens* claim against the

> offending individual officer, subject to the defense of qualified immunity. The prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP. With respect to the alleged constitutional deprivation, his only remedy lies against the individual.

534 U.S. at 72. Further, in a <u>Bivens</u> case, the Plaintiff must specify the acts taken by each defendant which violate his Constitutional rights. <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2nd Cir. 1994); <u>See</u> <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 666 (3rd Cir. 1988) ("section 1983 claims[9] [have] the additional pleading requirement that the 'complaint contain a modicum of factual specificity identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs'").

    In <u>Bivens</u>, the Supreme Court held that it had the authority, "under general principles of jurisdiction" to "create 'a cause of action under the Fourth Amendment' against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations." <u>Egbert</u>, 142 S.Ct. at 1802. After <u>Bivens</u> was decided, the Supreme Court twice, "fashioned new causes of action under the Constitution—first, for a former congressional staffer's Fifth Amendment sex-discrimination claim, see *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, see *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)." <u>Egbert</u>, 142 S.Ct. at 1802.

    However, the Supreme Court has cautioned that implied remedies have been

---

[9] The Court notes that <u>Bivens</u> actions and § 1983 actions are both civil rights actions, and that <u>Bivens</u> actions regarding deprivation of civil rights have long been considered as the federal counterpart to state actions authorized by 42 U.S.C. § 1983. As discussed below, <u>Egbert v. Boule</u>, 142 S.Ct. 1793 (2022), explains the difference between the statutorily created remedy under § 1983, and the judicially created remedies established by <u>Bivens</u> and its progeny.

found in limited circumstances[10], and the judiciary should not "assume[ ] common-law powers to create causes of action." Egbert v. Boule, 142 S.Ct. 1793, 1802 (2022) (quoting Malesko, 534 U.S. at 75). In Egbert, the Supreme Court held that, "[a]t bottom, creating a cause of action is a legislative endeavor. Courts engaged in that unenviable task must evaluate a 'range of policy considerations . . . at least as broad as the range . . . a legislature would consider.'" 142 S.Ct. at 1802, quoting Hernandez v. Mesa, 589 U.S. at 93, 140 S.Ct. at 741 (2020).

Further, the Egbert court explained that to recognize new Bivens remedies, a court must make a two-step inquiry to determine if: (1) the case presents a new Bivens context which is meaningfully different from the three cases in which the Supreme Court has

---

[10] The Supreme Court in Egbert, 142 S.Ct. at 1799 - 1800, noted that it has declined to imply a similar cause of action for alleged constitutional violations in the following instances: Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (race discrimination suit brought by enlisted naval men); Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (aerospace engineer's First Amendment defamation and retaliation suit against director of federal space flight center); United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (military veteran who volunteered for chemical warfare testing program sued for being unknowingly being administered LSD which caused psychological and personality changes); Schweiker v. Chilicky, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (improper denial of Social Security benefits, allegedly as result of due process violations); FDIC v. Meyer, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (terminated employee's Fifth Amendment suit claiming deprivation of a property right without due process); Correctional Services Corp. v. Malesko, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (federal inmate with a heart condition who was assigned to a Community Correctional Center's fifth floor bedroom suffered a heart attack and fell, after defendant's employee required inmate to use the stairs instead of the elevator to reach his bedroom); Wilkie v. Robbins, 551 U.S. 537, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (commercial rancher's Racketeer Influences and Corrupt Organizations Act (RICO) and Bivens claims against Bureau of Land Management (BLM) for allegedly using extortion to force rancher to grant an easement to BLM was without merit); Hui v. Castaneda, 559 U.S. 799, 130 S.Ct. 1845, 176 L.Ed.2d 703 (2010) (survivors of immigration detainee sued after detainee persistently sought, but was denied medical treatment, and later died of metastatic cancer, based on immunity for U.S. Public Health Service employees); Minneci v. Pollard, 565 U.S. 118, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012) (federal inmate sued for denial of adequate medical care by employees at privately run federal prison, was without relief under Bivens because state tort law authorized adequate alternative damages actions); Ziglar v. Abbasi, 582 U. S. 120, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017) (alien detained after September 11 terrorist attack filed suit alleging harsh and punitive pre-trial conditions in violation of Fifth Amendment); Hernández v. Mesa, 589 U. S. 93, 140 S.Ct. 735, 206 L.Ed.2d 29 (2020) (parents of 15-year old Mexican child shot and killed by United States Border Patrol agent across US-Mexico border after child crossed into US territory and returned to Mexico, not entitled to relief under theory of Bivens liability for violations of Fourth or Fifth Amendments).

implied a damages action; and (2) if the claim does arise in such a new context, whether there are special factors which indicate that Congress is better equipped than the judiciary to weigh the costs and benefits of allowing a damages action. Significantly, the Supreme Court wrote that, [i]f there is even a single "reason to pause before applying *Bivens* in a new context," a court may not recognize a *Bivens* remedy." 142 S.Ct. at 1803, quoting Hernández, 589 U. S., at 102, 140 S.Ct., at 743. The Supreme Court further explained:

> Finally, our cases hold that a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure. If there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action. Importantly, the relevant question is not whether a *Bivens* action would disrupt a remedial scheme, or whether the court should provide for a wrong that would otherwise go unredressed. Nor does it matter that existing remedies do not provide complete relief. **Rather, the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy.**

142 S. Ct. at 1803–04 (emphasis added) (cleaned up).

### C.    Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted. The Federal Rules of Civil Procedure require only, "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited, "the accepted rule that a complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45–46.

Although a complaint need not contain detailed factual allegations, a plaintiff's obligation in pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." Twombly, 550 U.S. at 555. Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face." Id. at 555, 570. In Twombly, the Supreme Court found that "because the plaintiffs [ ] have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. at 570. Thus, a plaintiff must state a plausible claim in his complaint which is based on cognizable legal authority and includes more than conclusory or speculative factual allegations.

 "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id. at 678. "[D]etermining whether a complaint states a plausible claim . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Thus, a well-pleaded complaint  must offer more than, "a sheer possibility that a defendant has acted unlawfully," in order to meet the plausibility standard and survive dismissal for failure to state a claim.  Id. at 678.

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly,  it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943,

952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff.  Mylan Labs, Inc. v. Matkari, 7 F.3d1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

### D.    Motions for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion to, "demonstrate the absence of a genuine issue of material fact."  477 U.S. at 323. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a verdict." Anderson, 477 U.S. at 256. Thus, the nonmoving party must

present specific facts showing the existence of a genuine issue for trial, meaning that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.

To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, supra, at 248.

Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587. "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. citing First Ntl. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 155, 1592 (1968). See Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). Although any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Matsushita, 475 U.S. at 587–88. Anderson, 477 U.S. at 248–49.

# IV. ANALYSIS

## A.    Failure to Exhaust Administrative Remedies

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a). "Federal prisoners must exhaust their administrative remedies prior to filing § 2241 petitions. Failure to exhaust may only be excused upon a showing of cause and prejudice." McClung v. Shearin, 90 F. App'x 444, 445 (4th Cir. 2004) (citing Carmona v. United States Bureau of Prisons, 243 F.3d 629, 634-35 (2d Cir.2001), Little v. Hopkins, 638 F.2d 953, 953-54 (6th Cir.1981)). Exhaustion as provided in § 1997e(a) is mandatory, regardless of the relief offered through administrative procedures. Booth v. Churner, 532 U.S. 731, 741 (2001). Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth, 532 U.S. at 741). "Those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'" Porter, 534 U.S. at 524.

In the complaint, the Plaintiff asserts that he filed a grievance concerning the facts in his complaint through the prisoner grievance procedure. ECF No. 1 at 5. However, he states that he was prevented from properly exhausting his administrative remedy because:

> The BP-10 that was filed to the Mid-Atlantic Regional office was denied as being time barred due to the lockdown of the institution for covid-19 reasons.
>
> The BP-11 that was filed to the central office was answered in the same manner. The Regional Office and the central Office were aware that the institution was on lockdown due to the covid-19 outbreak. However[,] the administration refused to

> provide the Plaintiff with an institutional memo to excuse the
> delay in filing the administrative appeals which prohibited the
> Plaintiff from filing his appeal and exhausting his
> administrative remedies.

Id. at 7.

The Plaintiff's contention in the complaint that he was denied access to the administrative remedy system is inconsistent with the statements he made in the Administrative Remedy process. The Petitioner was notified in the Warden's December 16, 2022, response, "If dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Mid-Atlantic Regional Office, 302 Sentinel Drive, Suite200, Annapolis Junction, MD 20701. Your appeal must be received in the Regional Office within 20 calendar days from the date of this response." ECF No. 1-2 at 11. Accordingly, any appeal would have been due not later than January 5, 2023.

The Petitioner's Regional Appeal is undated, and does not allege that the facility staff refused to provide him with a memo to demonstrate that the delay in his appeal was not his fault. ECF No. 1-2 at 13. However, according to the Regional Appeal rejection notice, the appeal was received by the Regional Office on February 13, 2023, or forty-two days after 20-day deadline. Id. at 7.

Further, the Plaintiff's Central Office Administrative Remedy Appeal does not claim that the Plaintiff was prevented from timely filing his appeal by BOP staff. Id. at 14. Instead, that Appeal states, in part:

> The medical staff here at [FCI] Gilmer has attempted to [deny]
> the plaintiff access to the courts be [sic] stated that the
> Petitioner was late [filing] his [BP-10] administrative remedy
> which is a [First] Amendment violation. A prisoner['s] Eighth
> Amendment right is violated when prison doctors or officials
> are deliberately indifferent to the prison's serious medical
> needs.

Id. The Plaintiff did not provide verification from staff that his untimely filing was not his fault. Instead, he contends that a prison lockdown due to a COVID-19 outbreak prevented him from filing a timely appeal. Plaintiff's arguments are not supported by the facts.

The Declaration of Evan Aldridge states that the Plaintiff's institution was on lockdown from December 8–12, 2022, December 13–20, 2022, and March 2–9, 2023. ECF No. 37-5 at 1. The Warden's response to the Plaintiff's Administrative Remedy ID number 1143756-F1 was issued December 16, 2022. The first of two December 2022 institutional lockdowns occurred from December 8–12, 2022, and was over before the Warden issued his response. The second December 2022 institutional lockdown commenced on December 13, 2022, and ended December 20, 2022. The Warden issued his response on December 16, 2022, five days before the second lockdown ended. Any appeal to this decision would have been due on January 5, 2023. However, the Plaintiff's appeal was not delayed by five days, it was delayed by forty-two days. Moreover, the third institutional lockdown did not occur until after the Regional Office issued its rejection notice. Additionally, the Defendants submitted records which show that during the same period when the Plaintiff claims he did not have access to the administrative remedy process, that inmates at FCI Gilmer filed 64 separate administrative remedy claims at the institutional, regional, and central office levels. ECF Nos. 56-1 through 56-4. It appears that there was no justification for the Plaintiff's delay in filing his Regional appeal.

Two days after filing the Regional appeal, the Regional Office rejected the appeal, for two reasons: (1) the Plaintiff's appeal was untimely. "Regional appeals (BP-10) must be received within 20 days of the Warden/CCM response or receipt of the DHO Report. This time includes mail time"; and (2) the Plaintiff did not provide staff verification stating

the reason for untimely filing was not his fault. Id.

Further, the Regional rejection notice bears a handwritten notation which appears to read "Delivered to [inmate] by Unit Manager on 03/10/23," with an initialed signature. Id. Thus it appears that the third period of institutional lockdown occurred during the eight days immediately preceding the Plaintiff's receipt of his Regional Administrative Remedy rejection. The Plaintiff's Central Office appeal was received on April 4, 2023, and rejected on April 14, 2023. ECF No. 1-2 at 12. The Central Office Rejection Notice states that the administrative remedy was rejected because the reviewer concurred with the rejection rationale of the Regional Office and/or Institution. Id. The Plaintiff was further directed to follow directions provided on prior rejection notices. Id.

As recognized in Carmona, supra, which was cited by the Fourth Circuit in its opinion in McClung:

> [T]he interests of judicial economy and accuracy are served by requiring that, absent a showing of cause and prejudice, appeals proceed in the first instance through the federal agency review process. Following the administrative procedures could potentially obviate the need for judicial review, or at a minimum, develop the factual record at the agency level at a time when the disputed events are still relatively fresh in witnesses' minds. In this sense, it is the analogue of the exhaustion of state remedies requirement for a state prisoner seeking federal habeas review, and the results governing failure to take this path should be the same.
>
> Administrative autonomy is also served by requiring that a federal prisoner justify his failure to exhaust his intra-Bureau remedies. When, however, legitimate circumstances beyond the prisoner's control preclude him from fully pursuing his administrative remedies, the standard we adopt excuses this failure to exhaust.

Carmona, 243 F.3d at 634 (internal citations omitted).

The Bureau of Prisons' Program Statement (BOP PS) 1330.18 § 542.10 et seq.,[11] addresses the Bureau's Administrative Remedy Program, and directs inmates on the processes necessary to exhaust their administrative remedies by filing four mandatory[12] remedies: (1) an informal resolution (BP-8)[13]; (2) an administrative remedy at the facility (BP-9); (3) an appeal to the regional office (BP-10); and (4) a final appeal to the central office (BP-11). The Plaintiff failed to complete all four mandatory administrative remedies, although he contends that the Defendants, or other BOP officials are to blame for his failure to exhaust because he was denied access to the Courts, and denied a memo which justified his delayed appeal. Further, the Plaintiff does not contend that he was denied access to the necessary administrative remedy forms. Moreover, the Defendants have demonstrated that other inmates accessed the administrative remedy system sixty-four times during the same time period that the Plaintiff contends it was unavailable because of administrative lockdown.

The Plaintiff's failure to exhaust administrative remedies ignores the standard recognized by the Fourth Circuit in Hill v. Haynes, 380 F. App'x 268, 269, n.1 (4th Cir. 2010). Regardless of whether the Plaintiff first, presented his complaint informally to

---

[11] See https://www.bop.gov/policy/progstat/1330_018.pdf.

[12] Inmates who are incarcerated in Community Corrections Centers (CCCs) are not required to attempt informal resolution. BOP PS 1330.18 § 542.13.b.

[13] Many BOP institutional handbooks refer to the Informal Resolution Form as the BP-8 form. See:

1. FCI Waseca https://www.bop.gov/locations/institutions/was/was_ao_handbook_eng_031517.pdf;
2. FCI Oxford https://www.bop.gov/locations/institutions/oxf/OXF_aohandbook.pdf;
3. FPC Schuylkill https://www.bop.gov/locations/institutions/sch/SCH_camp_aohandbook.pdf;
4. USMC Springfield https://www.bop.gov/locations/institutions/spg/spg_ao_handbook050917.pdf;
5. USP Lewisburg https://www.bop.gov/locations/institutions/lew/LEW_smu_aohandbook.pdf;
6. FDC Tallahassee https://www.bop.gov/locations/institutions/tal/TAL_fdc_aohandbook.pdf;
7. FCI Fort Dix https://www.bop.gov/locations/institutions/ftd/FTD_aohandbook.pdf; and
8. USP/SCP McCreary https://www.bop.gov/locations/institutions/mcr/MCR_aohandbook.pdf.

prison staff using a BP–8 form, or second, filed an "Administrative Remedy Request" to the prison warden using a BP–9 form, he did not take the third and fourth steps necessary to timely exhaust his claims. The Plaintiff failed to take the third step by filing a **timely** appeal with the Regional Director using a BP–10 form to an adverse decision on the BP–9 from the warden.

Although he did not allege during the administrative remedy process that his delay was caused by staff, in his complaint the Plaintiff alleges that he was prevented by BOP staff from timely filing certain levels of his administrative remedy. The Plaintiff now contends that BOP staff prevented him from doing so when staff refused to provide him with a justification for his late Regional Appeal. However, the Defendants have submitted records related to the dates of institutional lockdown which do not justify the Plaintiff's forty-two day delay in filing his appeal. The Plaintiff's election to belatedly pursue administrative remedies is insufficient to excuse the exhaustion requirement, and the complaint should be dismissed without prejudice for failure to exhaust.

In Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 - 95 (1998), the Supreme Court wrote that "without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." See also Reinbold v. Evers, 187 F.3d 348, 359 n. 10 (4th Cir. 1999). Because this court lacks jurisdiction, this court cannot entertain the complaint.

### B.    Failure to State a Bivens Claim Against Defendants

Notwithstanding any failure to exhaust, a review of the complaint pursuant to 28 U.S.C. § 1915A(b), reveals that the Plaintiff fails to present a claim upon which relief can

be granted as to Defendants McCoy or Wilson. The Plaintiff seeks monetary damages for alleged violations of his Eighth Amendment rights, asserting he is entitled to relief based on the holding of <u>Bivens</u>. ECF No. 1. However, in <u>Egbert</u>, the Supreme Court explicitly instructed lower courts that <u>Bivens</u> remedies should be expanded in only limited circumstances.

After <u>Egbert</u>, the Fourth Circuit declined to extend a <u>Bivens</u> remedy to a plaintiff who alleged his Eighth Amendment rights were violated when "Federal prison officials exposed him to conditions that posed a constitutionally unacceptable risk to his health and safety and took deliberate actions that exposed him to a substantial risk of serious physical harm." <u>Tate v. Harmon</u>, 54 F.4th 839, 842 – 843 (4th Cir. 2022). In <u>Tate</u>, the Fourth Circuit defined the issues presented as, "(1) whether Tate's conditions-of-confinement claim falls within the context of *Bivens* and its progeny and, if not, (2) whether the district court erred in refusing to extend *Bivens* to provide a damages remedy for his claim." <u>Id.</u> Echoing the Supreme Court in <u>Egbert</u>, the Fourth Circuit in <u>Tate</u> recognized that, "in the 42 years following Carlson, which was decided in 1980, the Court has 'consistently rebuffed' every request—12 of them now—to find implied causes of action against federal officials for money damages under the Constitution. 54 F.4th at 843. "Against this now critical condition of *Bivens* jurisprudence and the caution that the Court has mandated when applying it, courts are clearly warned to act with utmost hesitation when faced with actions that do not fall precisely under *Bivens*, *Davis*, or *Carlson.*" <u>Id.</u> at 845. The Fourth Circuit concluded:

> In short, courts' authority now to create new causes of action for money damages under the Constitution is most limited, for "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the

system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Ziglar*, 137 S. Ct. at 1858. And even "uncertainty alone" in this regard "forecloses relief." *Egbert*, 142 S. Ct. at 1804.

54 F.4th at 845.

The Plaintiff's Complaint fails to allege that Defendants McCoy or Wilson took specific actions which constitute civil rights violations as recognized by Bivens, Davis, or Carlson. Accordingly, this Court must conduct the two-part Egbert analysis to determine if the action should proceed, by determining:

> (1) if Plaintiff's case presents a new Bivens context, which is meaningfully different from the three cases in which the Court has implied a damages action; and

> (2) if Plaintiff's claim does arise in a new context, whether there are special factors present which indicate the Judiciary is less equipped than Congress to weigh the costs and benefits of allowing the damages action to proceed.

142 S.Ct. at 1803.

### 1.    The Plaintiff's Case Presents a New Bivens Context

As argued by the Defendants, the Plaintiff's claims—that his Eighth Amendment rights were violated by the Defendants who were deliberately indifferent to the Plaintiff's medical conditions—constitutes a new context that were not previously recognized by Bivens, Davis, or Carlson. A review shows that all three of those cases are distinguishable from Plaintiff's claims, consistent with the arguments made by the Defendants in their memorandum in support of the motion to dismiss. ECF No. 37 at 18–31.

Construed liberally, the Plaintiff asserts that his Eighth Amendment rights were violated by the Defendant's actions. However, only one of the three judicially created

causes of action is arguably comparable to Plaintiff's claims. <u>Bivens</u> recognized a cause of action under the Fourth Amendment, and thus is not comparable to the Plaintiff's claims. <u>Davis</u> recognized a cause of action under the Fifth Amendment, and again, is not comparable to the Plaintiff's claims. Only <u>Carlson</u> recognized a civil rights action under the Eighth Amendment based on failure to provide sufficient medical care. However, <u>Carlson</u> is distinguishable from the Plaintiff's claims.

<u>Carlson</u> was brought by a mother on behalf of her deceased son's estate, "alleging that he suffered personal injuries from which he died because the petitioners, federal prison officials, violated his due process, equal protection, and Eighth Amendment rights." 446 U.S. at 14. Note 1 of <u>Carlson</u> more fully explains the claims raised:

> More specifically, respondent alleged that petitioners, being fully apprised of the gross inadequacy of medical facilities and staff at the Federal Correction Center in Terre Haute, Ind., and of the seriousness of Jones' chronic asthmatic condition, nonetheless kept him in that facility against the advice of doctors, failed to give him competent medical attention for some eight hours after he had an asthmatic attack, administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital. The complaint further alleges that Jones' death resulted from these acts and omissions, that petitioners were deliberately indifferent to Jones' serious medical needs, and that their indifference was in part attributable to racial prejudice.

446 U.S. at 16, n.1.

By contrast, the Plaintiff here claims that the Defendants were deliberately indifferent to the Plaintiff's medical condition. ECF No. 1 at 8–10. The Plaintiff claims that the Defendants denied or prevented the Plaintiff from receiving medical care or screening in May 2022, and contends that he did not receive a diagnosis of illness, intestinal bacteria

"that resulted in Irritable Bowel Syndrome," ("IBS") until July 2023.[14] Id. at 10. In one of the Plaintiff's affidavits attached to the complaint, the Plaintiff asserts that he was told on June 12, 2023, that he had contracted IBS. ECF No. 1-1 at 3. The complaint is silent as to the Plaintiff's November 2023, diagnosis of H. pylori, because it was filed on September 5, 2023, two months before that positive test. Moreover, the records submitted by the Defendants demonstrate that the Plaintiff was provided medical treatment on fifty dates between May 11, 2022, and April 16, 2024. ECF No. 38-2. See also Section IV.C. herein. Moreover, during that period, the Plaintiff was tested for H. pylori at least three times and found to be negative prior to his November 2023 positive H. pylori test. ECF No. 38-2 at 246, 302. The BOP Health Services first documented and treated the Plaintiff's positive H. pylori test result on November 9, 2023. Id. at 118, 205, 246.

It is clear that the Plaintiff's complaint concerning his alleged medical conditions is that he now has bacteria in his intestines and stomach as a result of the complained-of denial of medical treatment. ECF No. 1 at 11. That claim is not supported by the medical records which show many medical treatments, and at least three tests for H. pylori before it was found. Moreover, that claim is in no way equivalent to the allegations in Carlson of: (1) a pre-existing chronic and life-threatening illness, asthma; (2) inadequate access to medical treatment and medical providers; (3) delay in treatment for more than eight hours after an acute onset of illness; (4) administration of contraindicated medication which worsened the patient's condition; (5) the use of machinery known to be inoperable to

---

[14] However, according to the Mayo Clinic, "[t]he exact cause of IBS isn't known." https://www.mayoclinic.org/diseases-conditions/irritable-bowel-syndrome/symptoms-causes/syc-20360016. According to the Cleveland Clinic, "[r]esearchers don't know exactly what causes IBS, but they classify it as a neurogastrointestinal (GI) disorder." https://my.clevelandclinic.org/health/diseases/4342-irritable-bowel-syndrome-ibs.

attempt to treat the patient; and (6) failure to transport the patient for outside treatment for the acute onset of illness. The specificity of such injuries and actions of Defendants in Carlson differ dramatically from the situation presented by the Plaintiff.

The Fourth Circuit has cautioned that:

> The Supreme Court has instructed not only that "new context" must be understood broadly but also that a new context may arise if *even one* distinguishing fact has the potential to implicate separation-of-powers considerations. While not providing an exhaustive list of distinguishing factors, the Court has noted examples that would support finding a new context, such as (1) uncertainty alone as to whether allowing a *Bivens* claim would have systemwide consequences; (2) a new category of defendants; (3) a difference as small as the rank of the officers involved; (4) the statutory or other legal mandate under which the officer was operating; (5) a potential effect on foreign relations and national security; (6) Congress's repeatedly declining to authorize the award of damages in the relevant context; and (7) the risk that the burden and demand of litigation would prevent Executive Officials from devoting the time and effort required for the proper discharge of their duties.

54 F.4th at 846 (cleaned up).

The Plaintiff's alleged injuries occurred in a different context than the injuries incurred in Carlson. Further, Congress has never authorized a suit for damages under similar claims as those raised by the Plaintiff. Thus, Plaintiff's claim arises in a new Bivens context. Accordingly, the Court must conduct the Egbert special factors analysis before allowing Plaintiff's suit to proceed.

> **2.    There are special factors counselling hesitation and which indicate the Judiciary is less equipped than Congress to weigh the costs and benefits of allowing the damages action to proceed**

As recognized by the Fourth Circuit in Tate, the Supreme Court has directed that the "special factors" inquiry "must center on "separation-of-powers principles." 54 F.4th at

844 (quoting Ziglar, 137 S. Ct. 1843, 1857 (2017)). The Fourth Court further explained the importance of the separation of powers principle:

> We thus consider the risk of interfering with the authority of other branches, and we ask whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," and "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."

54 F.4th at 844–45 (quoting Ziglar, 137 S.Ct.at 1857). Further, in Tate the Fourth Circuit recognized that, "[a]gainst this now critical condition of Bivens jurisprudence and the caution that the Court has mandated when applying it, courts are clearly warned to act with utmost hesitation when faced with actions that do not fall precisely under Bivens, Davis, or Carlson." 54 F.4th at 845. The Supreme Court in Ziglar previously recognized that:

> When a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis. The question is "who should decide" whether to provide for a damages remedy, Congress or the courts?

Ziglar v. Abbasi, 137 S. Ct. at 1857 (quoting Bush v. Lucas, 462 U.S. 367, 380, 103 S.Ct. 2404, 2413 (1983)).

In Tate, the Fourth Circuit recognized the directive of the Supreme Court in Egbert that, "the absence of a remedy for a wrong is ordinarily for Congress to fix, not the courts." 54 F.4th at 847. In Egbert, the Supreme Court wrote:

> The Bivens inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action. A court faces only one question: whether there is any rational reason (even one) to think that

> *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed.

Egbert, 142 S. Ct. at 1805 (cleaned up). Following the directive of Egbert, the Fourth Circuit in Tate concluded:

> [I]n this context, the political branches are indeed "better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." [142 S.Ct.] at 1804 (cleaned up). This is especially so because we are ill-suited to "predict the systemwide consequences of recognizing a cause of action under *Bivens*," and even our "uncertainty" on that question "forecloses relief." *Id.* at 1803, 1804 (cleaned up).
>
> In short, the "special factors" counseling hesitation here in providing a new cause of action are similar in kind to the factors distinguishing Tate's claim from the claim in *Carlson.* Heeding the Supreme Court's warning that courts should not be in the business of creating causes of action and that they must give the legislative branch "utmost deference" in considering whether to do so, our uncertainty is itself sufficient to resolve Tate's claims.

54 F.4th at 848. In reviewing the Plaintiff's claims, the undersigned finds that the same factors which counseled hesitation in Tate, are present here. This Court is ill-suited to predict the systemwide consequences of recognizing a cause of action under Bivens. As the Supreme Court in Egbert noted, '[t]hat uncertainty alone is a special factor that forecloses [Bivens] relief." 596 U.S. at 493. While uncertain whether allowing the Plaintiff's Bivens claim to proceed would have systemwide consequences, the undersigned recognizes that where one prisoner's action is successful, other prisoners often raise similar claims in separate suits for damages. Thus, such uncertainty on the question of systemwide consequences as a result of recognizing a new Bivens action forecloses relief here, as it did in Tate. Accordingly, the Court finds that the Plaintiff has failed to state a

claim upon which relief may be granted, and his claims should be dismissed with prejudice.

### C.    Defendants' Motion for Summary Judgment as to Plaintiff's Deliberate Indifference to Medical Needs Claim

Further, the Plaintiff's complaint [ECF No. 1] and response [ECF No. 51] to the Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, both fail to set forth specific facts showing that there is a genuine issue for trial. While the complaint alleges that the Defendants were deliberately indifferent to the Plaintiff's medical conditions, the only allegation in the Complaint which indicates the Defendants were responsible for denying the Plaintiff medical care, or were present, or involved with any alleged denial of his medical care, relates to the Plaintiff's claim that he was not given the "necessary medical screening." Id. at 11. The Plaintiff's sole claim against the Defendants is that they were both deliberately indifferent to his medical needs. However, the Plaintiff's complaint and attachments thereto acknowledge that the Plaintiff received medical care on or about the following dates: January 2022, May 11, 2022, June 2022, July 2022, September 2022, October 2022, November 2022, December 2022, March 29, 2023, June 12, 2023. ECF Nos. 1, 1-1.

Further, the Defendants' exhibits[15] include medical records for the Plaintiff which demonstrate he received medical care on the following dates:

(1)    May 11, 2022 [ECF No. 38-2 at 119, 166–169, 201, 203, 240, 302];

(2)    May 12, 2022 [Id. at 234–235];

---

[15] The medical records also contain records which predate the Plaintiff's alleged onset of symptoms in May 2022. Although the undersigned has reviewed the same, those records prior to May 2022, are not relevant to the Plaintiff's claims for relief. However, as early as July 26, 2021, the Plaintiff requested a colon cancer screening, although at that time he was asymptomatic. ECF No. 38-2 at 101.

(3)    May 16, 2022 [Id. at 228, 230, 232–233];

(4)    May 18, 2022 [Id. at 229];

(5)    May 20, 2022 [Id. at 231];

(6)    May 28, 2022 [Id. at 164];

(7)    July 12, 2022 [Id. at 38–39, 119–120, 154–161, 203, 303];

(8)    July 13, 2022 [Id. at 218, 222, 226];

(9)    July 14, 2022 [Id. at 218–219, 223–225, 227];

(10)    July 18, 2022 [Id. at 203];

(11)    July 22, 2022 [Id. at 206–207, 219–221];

(12)    July 27, 2022 [Id. at 216–217];

(13)    September 28, 2022 [Id. at 149–150];

(14)    October 11, 2022 [Id. at 29, 197, 294];

(15)    November 23, 2022 [Id. at 37, 119, 148, 205, 302];

(16)    December 6, 2022 [Id. at 289–291, 293, 401–09];

(17)    December 7, 2022 [Id. at 309];

(18)    December 8, 2022 [Id. at 293, 301, 367–400];

(19)    January 9, 2023 [Id. at 285–288, 301, 366];

(20)    January 11, 2023 [Id. at 37, 119, 279–284, 301];

(21)    January 17, 2023 [Id. at 363–65];

(22)    January 18, 2023 [Id. at 326 – 328];

(23)    January 30, 2023 [Id. at 213–214];

(24)    March 29, 2023 [Id. at 361–62];

(25)    March 30, 2023 [Id. at 278];

(26)    June 13, 2023 [Id. at 272–277, 298, 300–301];

(27)    August 1, 2023 [Id. at 269–271, 300];

(28)    August 28, 2023 [Id. at 266–268, 300, 360];

(29)    September 5, 2023 [Id. at 259–265, 300];

(30)    September 18, 2023 [Id. at 314–325];

(31)    September 25, 2023 [Id. at 37, 119, 257–258, 302];

(32)    October 2, 2023 [Id. at 29, 113, 197, 294];

(33)    October 24, 2023 [Id. at 254–256, 300];

(34)    November 2, 2023 [Id. at 310, 358];

(35)    November 3, 2023 [Id. at 90–93, 329–357];

(36)    November 7, 2023 [Id. at 119, 247–253];

(37)    November 9, 2023 [Id. at 26, 37, 118];

(38)    December 11, 2023 [Id. at 22–24, 35];

(39)    December 29, 2023 [Id. at 14–21, 34–35];

(40)    January 11, 2024 [Id. at 13, 88];

(41)    February 7, 2024 [Id. at 69–70];

(42)    February 8, 2024 [Id. at 56, 59–60, 66];

(43)    February 12, 2024 [Id. at 60–65];

(44)    March 4, 2024 [Id. at 10–11, 34, 37, 41];

(45)    March 12, 2024 [Id. at 34, 48–51];

(46)    March 14, 2024 [Id. at 7–9, 34];

(47)    March 21, 2024 [Id. at 73–74, 78–86];

(48)    April 9, 2024 [Id. at 3–5, 34];

(49)    April 11, 2024 [Id. at 52, 54]; and

(50)    April 16, 2024 [Id. at 1–2].

Those treatments included outside appointments for an endoscopy, an esophagogastroduodenoscopy (EGD)[16] with biopsy, a colonoscopy, and chronic care treatments for the Plaintiff's diabetes.

Following a December 8, 2022, colonoscopy, the Plaintiff was tested for H. pylori on January 18, 2023, and September 5, 2023, but H. pylori was not detected. ECF No. 38-2 at 262, 265, 270, 326. On November 3, 2023,[17] the Plaintiff was again tested for H. pylori which was found. ECF No. 38-2 at 246, 302. On November 9, 2023, the date that the BOP Health Services documented the Plaintiff's positive H. pylori test, he was also prescribed four medications to treat the condition. Id. at 246. The Plaintiff contends that he first experienced symptoms of H. pylori in May of 2022, eighteen months before H. pylori was confirmed. In the intervening eighteen months, the Plaintiff was provided medical care on thirty-six separate dates, for an average of one appointment every two weeks for the entire period.

As to the Plaintiff's claim that he was denied the necessary medical screening for H. pylori, his medical records contradict that claim. The Plaintiff was given two H. pylori screenings which were negative before his positive result was received on November 9, 2023. The repeated testing and repeated medical treatments provided to the Plaintiff demonstrate that the Defendants were not deliberately indifferent to the Plaintiff's medical

---

[16]  Esophagogastroduodenoscopy (EGD) is procedure to examine the upper gastrointestinal tract, where an endoscope passes down the throat to visualize the esophagus, stomach and duodenum. See https://my.clevelandclinic.org/health/diagnostics/22549-esophagogastroduodenoscopy-egd-test.

[17]  The sample appears to have been collected on November 3, 2023. ECF No. 38-2 at 330. The pathologist electronically signed his reported findings on that same date. Id. However, the BOP Health Services first documented the positive H. pylori test result on November 9, 2023. Id. at 118, 205, 246.

condition.

Even the medical records which the Plaintiff submitted with his complaint reflect that even seven months after he first complained of symptoms, that doctors could find nothing wrong with the Plaintiff's gastrointestinal tract. ECF No. 1-4. However, the Plaintiff continued to receive medical treatment and testing to diagnosis his reported gastrointestinal condition. The Plaintiff was seen at Stonewall Jackson Memorial Hospital by Ronald Pearson, MD, on December 8, 2022, at which time a colonoscopy was discussed and performed. Id. at 5–30. The results of that test found that the Plaintiff, "is found to have essentially normal examination. However multiple random colonic biopsies were obtained to check for microscopic colitis." Id. at 14. The Plaintiff's physician recommended that he repeat the colonoscopy procedure in ten years. Id. at 15. The Plaintiff also submitted the surgical pathology report prepared from the colonoscopy samples by Lixin Zhang, MD, which found "[u]nremarkable colonic mucosa," and "[n]egative for microscopid colitis, active inflammation, granuloma, or dysplasia." Id. at 37.

Attached to his response to the Defendants' Motion to Dismiss, or in the Alternative, Motion for summary judgment, the Plaintiff included multiple sworn affidavits, including three affidavits which the Plaintiff himself signed, and four affidavits, by fellow inmates Anthony Williams, Karlos Clinton, Dennis Johnson, and Malcolm Carpenter. ECF No. 51-1.[18] The Plaintiff's first affidavit contends that from May 2023,[19] through November 2023, he "repeatedly requested to be tested" for H. pylori, but was denied, and instead

---

[18] The Defendants assert that "[m]ost of the affidavits provided are primarily hearsay, and the affiants are simply repeating that they heard about problems and that Mr. Thacker tested positive" for H. pylori. ECF No. 56 at 3.

[19] The Plaintiff's complaint contends that his symptoms began in May 2022, but the first affidavit attached to his Response lists the start date as May 2023.

directed to buy over the counter medications for pain. Id. at 1. In his second affidavit the Plaintiff claims that in June and July of 2022, he complained of constant stomach pain, that other inmates had contracted H. pylori, but that he was denied an H. pylori screening. Id. at 2. The Plaintiff's third affidavit asserts that beginning in November 2022, he began the administrative remedy process concerning his stomach problems, but that he was delayed in filing his regional appeal because the institution was on lockdown in January through February of 2023. Id. at 4.

The affidavits signed by other prisoners assert that the institutional water supply was contaminated, that multiple inmates also suffered abdominal or gastrointestinal distress, and that the Plaintiff was denied H. pylori testing. Id. at 6–12. All four of the fellow inmates' affidavits assert that the Plaintiff complained of stomach pain in May or June of 2022. Id. Three of the four stated that in November 2023, the Plaintiff tested positive for H. pylori, with the fourth stating that the Plaintiff's positive H. pylori test was almost a year later than his initial complaints of stomach problems. Id. Other than the affidavits, the Plaintiff did not provide additional medical records, or other documentation that supports his claim that the Defendants were deliberately indifferent to his medical needs. However, the claims asserted in the affidavits of the Plaintiff and fellow inmates are flatly contradicted by exhibits submitted by the Defendants.

The Plaintiff was given H. pylori tests on January 18, 2023, and September 5, 2023, but H. pylori was not detected. ECF No. 38-2 at 262, 265, 270, 326. A third test administered in November 2023, revealed that the Plaintiff was then positive for H. pylori. The Plaintiff's claims that he was denied treatment and testing are without merit, as his medical records clearly show otherwise.

Further, as addressed above and contrary to the Plaintiff's argument, FCI Gilmer was not on institutional lockdown in January or February of 2023, that would have prevented him from filing a timely appeal to the Warden's denial of his administrative remedy. See ECF No. 37-5.

The Plaintiff as the nonmoving party has failed to present specific facts showing the existence of a genuine issue for trial, as required by Anderson. In that case, the Supreme Court further held that the Plaintiff, in "opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, at 256. The Plaintiff has rested on denials of the pleading, but has set forth no specific facts showing that there is a genuine issue for trial.

Further, in Matsushita the Supreme Court held that summary judgment is proper only where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party" and "[w]here the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" 475 U.S. at 587, citing First Ntl. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 155, 1592 (1968). The record in this case when taken as a whole could not lead a rational trier of fact to find that the Plaintiff was denied medical treatment. For all of these reasons, the Defendants motion for summary judgment should be and the Plaintiff's dismissed with prejudice.

### D.    Failure to Respond to Defendant's Legal Arguments

Finally, in addition to the reasons cited above, although the Plaintiff filed a response to the motion to dismiss, his response to the legal arguments raised by the

Defendants was tangential at best. Instead, the Plaintiff addressed mainly factual issues, repeating many of the arguments made in his Complaint, apparently relying upon the equities of his alleged claims to merit relief. However, as noted above, the Supreme Court in Egbert, and the Fourth Circuit in Tate, have held that extension of Bivens remedies in new contexts should be considered with extreme caution and deference to Congress. The Court declines to address the equities argued by the Plaintiff because the law so clearly supports Defendants' motion to dismiss.

As noted above, because "only those questions which are squarely presented to a court may properly be addressed," this Court may not construct Plaintiff's arguments for him. Weller, 901 F.2d at 391. Even when liberally construing the Plaintiff's allegations, he fails to assert any claims that the named Defendants subjected, or caused him to be subjected, to the deprivation of any rights, privileges, or immunities which are secured by the Constitution and laws. Instead, the Plaintiff urges this Court to judicially expand civil rights remedies, in direct contravention of the holdings of superior courts. The Court declines to do so. Accordingly, for all of the above reasons, the Plaintiff has failed to state a claim for monetary relief, and his claims must be dismissed with prejudice.

## V. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the complaint [ECF No. 1] be **DISMISSED WITHOUT PREJUDICE**, because the Court lacks jurisdiction based on the Plaintiff's failure to exhaust administrative remedies. It is further **RECOMMENDED** that the Defendants' Motion [ECF No. 36] to Dismiss, or in the Alternative, Motion for Summary Judgment be **GRANTED**.

It is further **RECOMMENDED** that the Plaintiff's Motion [ECF No. 50] for Judicial

Notice of the Code of Federal Regulations, and Bureau of Prisons Program Statements be **TERMINATED** as **MOOT**, because those regulations and Program Statements were considered and addressed herein.

**Within fourteen (14) days** after being served with a copy of this Recommendation, any party may file with the Clerk of the Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet and to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED:    August 13, 2024

/s/ *Robert W. Trumble*
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE